## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| OCTAVIO CHAVES, on behalf of himself and all others similarly situated<br><br>      Plaintiff,<br>v.<br><br>TRANSPORTES AÉREOS PORTUGUESES, S.A. d/b/a TAP AIR PORTUGAL,<br><br>      Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT

Plaintiff, Octavio Chaves ("Chaves" or "Plaintiff"), on behalf of himself and all others similarly situated by and through undersigned counsel, files this Class Action Complaint against TRANSPORTES AÉREOS PORTUGUESES, S.A. d/b/a TAP Air Portugal, ("TAP" or "Defendant"), and alleges the following:

### INTRODUCTION

1. TAP is the flag carrier airline of Portugal. TAP is Portugal's leading airline and has been a member of the global airline Star Alliance since 2005. The airline is headquartered at Lisbon Airport and operates, on average, 2,500 flights a week to 90 destinations in 34 countries worldwide.

2. TAP typically operates multiple daily or weekly flights between Portugal and various destinations in the United States, including Chicago, Washington, D.C., Miami, Boston, and San Francisco. TAP also typically operates four daily flights to New York. But this year, instead of increasing scheduled flight service as planned, TAP has responded to a sudden drop in demand for passenger air travel by canceling scores of scheduled flights.

3. Under the terms of TAP's uniform contracts with its customers, when the airline cancels a flight, the airline must either re-accommodate passengers on the next available flight or

1

refund the passengers. TAP has breached its contracts with thousands of paying customers by offering credits for future travel on the airline instead of providing refunds for flights canceled by the airline.

### Declining Demand in Light of Novel Coronavirus Severely Impacts TAP's Operation

4. On December 31, 2019, governmental entities in Wuhan, China confirmed that health authorities were treating dozens of cases of a mysterious, pneumonia-like illness. Days later, researchers in China identified a new virus that had infected dozens of people in Asia, subsequently identified and referred to as the novel coronavirus, or SARS-CoV-2. The illness caused by the virus has been termed COVID-19. By January 21, 2020, officials in the United States were confirming the first known domestic cases of COVID-19.

5. Due to an influx of thousands of new cases in China, on January 30, 2020, the World Health Organization officially declared COVID-19 as a "public health emergency of international concern."

6. On March 11, 2020, the World Health Organization declared COVID-19 a pandemic.

7. In efforts to curb the spread of the virus, federal, state and local governments have implemented temporary travel restrictions and guidelines advising against essential travel. In the United States, the federal government has limited travel from China, Europe, and the United Kingdom, permitting only the return of U.S. citizens and permanent residents. The Department of State also advised on March 19, 2020, that U.S. citizens should temporarily avoid all international travel, with the exception that U.S. residents abroad should arrange for immediate return to the United States where possible.

8. State and local governments have also restricted local travel. On March 16, 2020, seven counties in the San Francisco, California area announced shelter-in-place orders to reduce local traffic to activities necessary to perform "essential" activities. Other states, counties, and municipalities have since implemented similar shelter-in-place orders, and as of the drafting of this Class Action Complaint,

at least 316 million people in at least 42 states, three counties, nine cities, the District of Columbia, and Puerto Rico are living under such orders.

9. In addition to health and safety concerns, people across the country are facing increasing economic stress due to the novel coronavirus, including unemployment levels not seen since the Great Depression.

10. As the travel limitations, virus fears, and economic uncertainties mounted, consumer demand for air travel, particularly leisure and non-essential business travel, quickly declined. In response to this declining demand, TAP has cancelled many flights in and to the United States to avoid flying planes with too many empty seats to be profitable.

11. The main way that airlines like TAP determine operational capacity (*i.e.*, how many flights it markets and flies) is by looking at passenger "load factors" on each route. Load factors measure the percentage of seats filled on an aircraft (or set of aircraft) scheduled to depart. Load factors can be determined for an overall schedule (all flights to all destinations), for particular routes (all flights between two airports), or for particular flight service (a specific scheduled flight with its own flight number). If load factors fall too low, airlines will determine that operating flight service as scheduled would not be profitable (or otherwise economically desirable) and will then typically modify the schedule—including by cancelling previously scheduled flights.

12. TAP's overall load factor is typically around 80-81%. But with declining customer demand in light of COVID-19, the airline has seen significant drops in its load factors.

13. Driven by the drop in travel demand, TAP began cutting flights in March of 2020, to match the reduced demand. TAP first announced the cancellation of around 1,000 flights due to the "strong slowdown in demand."[1] On March 9, 2020, TAP announced that it would cut 3,500 flights in

---

[1] Press Release, TAP, Coronavirus COVID-19 (March 5, 2020), https://www.tapairportugal.com/en/media/press-releases/Press-Release-836.

3

March, April, and May 2020.[2] On March 19, 2020, TAP announced the "sharp drop in demand" and other COVID-19-related concerns had already caused "innumerable successive flight cancellations and route suspensions."[3] In response to continued declining demand, the airline announced it would "ground a large part of its fleet."[4]

### TAP Offers Customers Credit Where Refunds Are Due

14. When TAP cancels a flight, its contracts with its passengers require the airline to either (1) provide a full refund, or, at the customer's option, (2) reaccommodate the passengers to their destination on the next available flight or on another date selected by the passengers. The contract terms governing cancellations by the airline only give TAP the option of providing customers with a credit or voucher for future travel on the airline instead of a refund if the airline receives written authorization from the customer.

15. Nevertheless, after cancelling a significant portion of its flights, TAP is only crediting passengers for their cancelled flights and requiring passengers to wait on hold for potentially hours in an attempt to obtain a refund, despite TAP's obligation to refund fares for cancelled flights.

16. TAP's early press releases concerning its many flight cancellations alerted customers that "TAP will contact all passengers affected by these cancellations and will seek to find the best options and alternatives that will enable them to take their trips."[5] They made no mention of the refunds to which canceled passengers are entitled. TAP made its policy of providing credits and not refunds even clearer in its March 19th press release regarding widescale flight cancellations:

---

[2] Press Release, TAP, TAP adjusts its capacity an [sic] supply to meet demand (March 9, 2020), https://www.tapairportugal.com/en/media/press-releases/Press-Release-837.
[3] Press Release, TAP, TAP adjusts its capacity an [sic] supply to meet demand (March 19, 2020), https://www.tapairportugal.com/en/media/press-releases/Press-Release-841
[4] *Id.*
[5] Press Release, TAP, Coronavirus COVID-19 (March 5, 2020), https://www.tapairportugal.com/en/media/press-releases/Press-Release-836; Press Release, TAP, TAP adjusts its capacity an [sic] supply to meet demand (March 9, 2020), https://www.tapairportugal.com/en/media/press-releases/Press-Release-837.

4

Customers affected by flight cancellations in this period should go to the website refunds.flytap.com, to get a voucher in the amount paid for the purchase of the ticket, so that they can easily decide where and when they want to travel.[6]

17. However, as will be explained below, TAP's Contract of Carriage ("Contract of Carriage") mandates refunds, not credits in this situation.

18. Instead of following the terms of its Contract of Carriage, TAP is unilaterally pushing vouchers or credits on customers, making it impossible for many customers to request refunds, and denying refunds when legitimate requests are made.

19. TAP is placing its concern for its own financial stability ahead of the significant economic impacts its consumers are facing in this unprecedented economic downturn. In just over one month, over 22 million people in the United States have applied for unemployment benefits, and the U.S. unemployment rate has climbed to over 20%—the worst it has been since the Great Depression. As many as one-third of the 40 million renters in the U.S. are unable to make their rent, and millions of people with home mortgages will likely face foreclosure. Now more than ever, customers whose flights or reservations have been cancelled by TAP need the prompt refunds to which they are entitled.

20. As numerous customers complained about this practice by TAP and other airlines, the DOT issued an Enforcement Notice Regarding Refunds by Carriers Given the Unprecedented Impact of the COVID-19 Public Health Emergency on Air Travel ("DOT Notice"). The DOT Notice provides that the airlines must refund tickets if they cancel flights due to the novel coronavirus:

> The U.S. Department of Transportation's Office of Aviation Enforcement and Proceedings (Aviation Enforcement Office), a unit within the Office of the General Counsel, is issuing this notice to remind the traveling public, and U.S. **and foreign carriers, operating at least one aircraft having a seating capacity of 30 or more seats**, that passengers should be **refunded promptly** when their scheduled flights are cancelled or significantly delayed. Airlines have long provided such refunds, including during periods when air travel has been disrupted on a large scale, such as the aftermath of the September 11, 2001 attacks, Hurricane Katrina, and presidentially declared natural disasters. Although the COVID-19 public health emergency has had

---

[6] Press Release, TAP, TAP adjusts its capacity an [sic] supply to meet demand (March 19, 2020), https://www.tapairportugal.com/en/media/press-releases/Press-Release-841.

an unprecedented impact on air travel, **the airlines' obligation to refund passengers for cancelled or significantly delayed flights remains unchanged.**

The Department is receiving an increasing number of complaints and inquiries from ticketed passengers, including many with non-refundable tickets, who describe having been denied refunds for flights that were cancelled or significantly delayed. In many of these cases, the passengers stated that the carrier informed them that they would receive vouchers or credits for future travel. But many airlines are dramatically reducing their travel schedules in the wake of the COVID-19 public health emergency. As a result, passengers are left with cancelled or significantly delayed flights and vouchers and credits for future travel that are not readily usable. **Carriers have a longstanding obligation to provide a prompt refund to a ticketed passenger when the carrier cancels the passenger's flight or makes a significant change in the flight schedule and the passenger chooses not to accept the alternative offered by the carrier. The longstanding obligation of carriers to provide refunds for flights that carriers cancel or significantly delay does not cease when the flight disruptions are outside of the carrier's control (e.g., a result of government restrictions). The focus is not on whether the flight disruptions are within or outside the carrier's control, but rather on the fact that the cancellation is through no fault of the passenger.** Accordingly, the Department continues to view any contract of carriage provision or airline policy that purports to deny refunds to passengers when the carrier cancels a flight, makes a significant schedule change, or significantly delays a flight to be a violation of the carriers' obligation that could subject the carrier to an enforcement action.[7]

(emphasis added).

21.     Thus, TAP's policy violates not only its own Contract of Carriage, but also federal law.

## PARTIES, JURISDICTION AND VENUE

22.     Plaintiff is a New York citizen who resides in Westbury, New York.

23.     Defendant is a Portuguese for-profit corporation having its principal place of business in Lisbon, Portugal.

24.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity

---

[7] U.S. Dep't of Transportation, Enforcement Notice Regarding Refunds by Carriers given the Unprecedented Impact of the COVID-19 Public Health Emergency on Air Travel (Apr. 3, 2020), https://www.transportation.gov/sites/dot.gov/files/2020-04/Enforcement%20Notice%20Final%20April%203%202020_0.pdf.

6

exists because many putative class members are citizens of a different state than Defendant.

25. Jurisdiction is also proper under Article 33 of the Convention for the Unification of Certain Rules for International Carriage by Air (Montreal Convention). TAP has a place of business in the United States through which the contract was made. In addition, the place of destination of Plaintiff's round-trip air travel ticket is in the United States, and specifically in this District.

26. Venue is proper in this Court pursuant to 28 U.S.C. §1391, because this is the judicial district in which a substantial part of the events giving rise to the claims asserted herein occurred.

## GENERAL ALLEGATIONS

27. On or about January 26, 2020, Plaintiff purchased tickets for round-trip travel from New York, New York to Lisbon, Portugal for travel on February 1, 2020, with a return date of April 7, 2020.

28. Plaintiff purchased the tickets directly from Defendant through the TAP website, paying a total of $1,389.52.

29. Plaintiff was able to travel to Portugal, but prior to the scheduled return date, Defendant cancelled the return flight. At first, Plaintiff was rebooked on a flight back to the United States on April 8, 2020, only one day after his scheduled return date. However, the April 8th flight was also cancelled, along with all other flights through May 1, 2020.

30. Plaintiff contacted TAP's customer service via its online chat function and asked for a refund, which TAP refused.

31. TAP informed Plaintiff that they could reaccommodate him on May 1, 2020, over three weeks after his scheduled return date. *Id.*

32. With Plaintiff needing to get home to his job and having nowhere to stay in Portugal, Plaintiff told TAP that the reaccommodation TAP offered was not acceptable. Plaintiff again

7

requested a refund so that he could find another way to return to New York. *Id.*

33. TAP again insisted that no refund is available and that his only option was rebooking. *Id.* However, TAP was not able to rebook Plaintiff's flight to Plaintiff's satisfaction, and he was forced to book a return flight to New York on another airline.

34. In sum, despite the fact that Plaintiff could not take the flight he booked because TAP canceled it, TAP failed to provide a refund to Plaintiff and, instead, only offered Plaintiff a voucher for use on a future TAP flight.

## The Contract

35. Every TAP passenger air travel ticket incorporates by reference (including in some cases by hyperlink) and is governed by TAP's Contract of Carriage. *See* Exhibit A.

36. The Contract of Carriage is currently posted on TAP's website at https://www.flytap.com/-/media/Flytap/PDF/Condicoes-de-Transporte/2020/Marco/2/GeneralTransportConditions_EN_PT_MAR20.pdf?la=en-US&hash=859CAAF4A687894B3F53D2C3F267DEEE52BF855E.

37. Article 9 of TAP's Contract of Carriage governs "Schedules, Delays, Cancellation of Flights," and states:

> Without prejudice to the provided for in any applicable law, if we cancel a flight of which we are the operating carrier and for which you have a confirmed reservation and you have presented yourself at check-in as indicated to you in writing (or electronically) or, lacking such indication, up to 45 minutes before the time foreseen for the departure of such flight, we shall offer you:
> a) **your choice of (i) the reimbursement, within seven Days (in cash, by electronic bank transfer, bank order, bank check or, with your written agreement, in travel vouchers and/or other services), of the full purchase price of your Ticket for the part or parts of the journey not made** and, if the flight is no longer serving any purpose in relation to your original travel plan, for the part or parts already made and, in this latter case and when applicable, a return flight (at the earliest opportunity) to your first point of departure or **(ii) the rerouting, under comparable transport conditions, to your final destination, at the earliest opportunity or (iii) the rerouting, under comparable transport conditions, to your final destination, at a later date of your convenience**, but subject to seats availability . . . .

8

Contract of Carriage Art. 9.2.2.

38. More specifically, the Contract of Carriage provides if no portion of the reservation has been used, the refund will be equal to "an amount equal to the fare paid plus, subject to applicable law, the taxes, fees and charges paid." Contract of Carriage 10.2.1.1. If a portion of the reservation has been used, "the amount of the refund will not be lower than the difference between the fare paid and the fare applicable fare to the travel between the points for which your Ticket/s has/have been used. Subject to any applicable law, the amount of taxes, fees and charges paid and to be paid will be taken in consideration." Contract of Carriage 10.2.1.2.

39. TAP's involuntary refund terms include no exceptions or limitations based on the reason for TAP's cancellation.

40. Rather, by the terms of the Contract of Carriage, when TAP cancels a flight—regardless of reason—passengers who had tickets on the cancelled flight have the option of receiving re-accommodation on the next available flight or a later flight on a date convenient to the passenger, or a prompt refund.

41. Here, Plaintiff was not transported at no additional charge on the next available flight or on a later date convenient to him. Thus, pursuant to the terms of the Contract of Carriage, Plaintiff is entitled to a refund in U.S. Dollars to his original form of payment.

## **CLASS ACTION ALLEGATIONS**

42. Pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2) and (b)(3), as applicable, Plaintiff seeks certification of the following nationwide class (the "Class"):

> All persons in the United States who purchased tickets for travel on a TAP flight scheduled to operate from March 1, 2020 through the date of a class certification order, whose flight(s) were cancelled by TAP, and who were not provided a refund.

43. Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries,

9

and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, members of their judicial staff, and any Judge sitting in the presiding court system who may hear an appeal of any judgment entered. Also excluded from the Class is any person who was re-accommodated and transported to their ticketed destination by Defendant.

44. Plaintiff reserves the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

45. The Class meets the criteria for certification under Rule 23(a), (b)(1), (b)(2), (b)(3) and (c)(4).

46. **Risk of Inconsistent or Varying Adjudications. Fed. R. Civ. P. 23(b)(1).** As the proposed Class members include thousands of persons across all 50 states, there is significant risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the Defendant. For example, declaratory relief may be entered in multiple cases, but the ordered relief may vary, causing the Defendant to have to choose the court order with which it will comply.

47. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical. While the exact number of Class members is unknown to Plaintiff at this time, it is believed that the Class is comprised of tens of thousands, if not hundreds of thousands of members geographically dispersed throughout the United States. Affected consumers' names and addresses are available from TAP's records, and Class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include electronic mail, U.S. Mail, internet notice, and/or published notice.

48. **Predominance of Common Issues. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class members. The common questions include:

    a. Whether Defendant's conduct breaches its Contract of Carriage;

    b.    Whether Defendant is required to give a refund, rather than credit on a future flight when it cancels a flight and cannot reaccommodate the passengers within a reasonable time of the original flight schedule;

    c.    Whether Plaintiff and members of the Class are entitled to damages, costs, or attorneys' fees from Defendant; and

    d.    Whether Plaintiff and members of the Class are entitled to compensatory damages.

49.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of other Class members' claims because Plaintiff and Class members were subjected to the same unlawful conduct and damaged in the same way. Defendant's conduct that gave rise to the claims of Plaintiff and other Class members (i.e., cancelling flights without giving refunds in breach of the Contract of Carriage) is the same for all Class members.

50.    **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's counsel are competent and experienced in litigating class actions, including extensive experience in litigating consumer claims. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

51.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs and class members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class members are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Moreover, individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the

court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

52. **Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole. Moreover, Defendant continues to offer credits instead of refunds to Plaintiff and Class members for flights that it cancels, thus making declaratory relief a live issue and appropriate to the Class as a whole.

## COUNT I - BREACH OF CONTRACT

53. Plaintiff realleges and reincorporates his allegations in paragraphs 1 through 52 above as if fully set forth herein.

54. This claim for breach of contract damages or, in the alternative, specific performance of the contract's refund terms, is based on Defendant's breaches of its Contract of Carriage (the "Contract").

55. Plaintiff, along with all putative class members, entered into a Contract with Defendant for provision of air travel in exchange for payment. This Contract was drafted by Defendant.

56. Plaintiff, and all putative Class members performed under the Contract, specifically, by tendering payment for the airline tickets to Defendant and complied with all conditions precedent under the Contract.

57. Due to Defendant's cancellation of their flights, Plaintiff, and all putative Class members, cannot use their airline tickets through no fault of their own and they are not getting the benefit of their bargain with Defendant.

58. Under the terms of the Contract drafted by Defendant, Plaintiff and putative Class members are entitled to refunds because TAP cancelled their flights and did not reaccommodate and transport the customers to their destinations on another flight. By failing to provide refunds, TAP has

breached its Contract.

59. TAP has further breached its Contract by failing to provide refunds within seven days for cancelled tickets purchased with credit cards. Contract of Carriage Art. 10.8.

60. As a result of Defendant's breaches of contract, Plaintiff and the putative Class members have incurred damages in an amount to be proven at trial.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all putative Class members, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

A. For an Order determining at the earliest possible time that this matter may proceed as a class action under Rule 23 and certifying this case as such;

B. For himself and each Class member their actual compensatory damages, or in the alternative, for specific performance of the refund provisions of the Contract of Carriage;

C. For reasonable attorneys' fees and costs of suit;

D. For pre-judgment interest; and

E. Such further and other relief the Court deems reasonable and just.

## JURY DEMAND

Plaintiff, on behalf of himself and the Class of all others similarly situated, hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: May 7, 2020 	Respectfully submitted,

/s/Laurie Rubinow
Laurie Rubinow
James C. Shah
**SHEPHERD FINKELMAN MILLER & SHAH, LLP**
52 Duane Street, 7th Floor
New York, NY 10007
Telephone: (212) 419-0156
Facsimile: (866) 300-7367
Email: lrubinow@sfmslaw.com
jshah@sfmslaw.com

Jeff Ostrow*
**KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT**
1 West Las Olas Blvd. Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
Email: streisfeld@kolawyers.com
ostrow@kolawyers.com

Hassan A. Zavareei*
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
Email: hzavareei@tzlegal.com

Annick M. Persinger*
**TYCKO & ZAVAREEI LLP**
1970 Broadway Suite 1070
Oakland, CA 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950
Email: choover@tzlegal.com

Melissa S. Weiner*
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, Minnesota 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
Email: mweiner@pswlaw.com

*pro hac vice* application forthcoming

*Counsel for Plaintiff and the Proposed Class*